IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| NDNB ASSURANCE, LLP, | § § § | |
| Claimant, | § § | |
| vs. | § § | |
| GIGA DATA CENTER-1 LLC (a Delaware LLC), and GIGA DATA CENTERS LLC, (a Georgia LLC) | § § § § § § | CIVIL ACTION FILE NO. _____ |
| Respondents | § § § | |

## CLAIMANT'S MOTION TO CONFIRM ARBITRAL AWARD

COMES NOW, NDNB ASSURANCE, LLP, (Plaintiff in the above-styled action but hereinafter sometimes referred to as "Movant") and files this its Motion to Confirm Arbitral Award as to GIGA DATA CENTER-1, LLC., (a Delaware LLC), and GIGA DATA CENTERS LLC, (a Georgia LLC), (Respondents in the above-styled matter) and shows the following:

1.

GIGA DATA CENTER-1 LLC is a Delaware Limited Liability Company that may be served through its Registered Agent, Capitol Services, Inc., 108

1

Lakeland Avenue, Dover, DE   19901.

2.

GIGA DATA CENTERS, LLC is a Georgia Limited Liability Company that may be served through its Registered Agent, John R. Ring, Jr., 4455 Lower Roswell Road, Unit 682916, Marietta,   GA   30068.

3.

Petitioner files this Motion pursuant to the Federal Arbitration Act for confirmation of the award pursuant to 9 U.S.C. § 9. This Court has subject matter jurisdiction over this matter in that this Petition is subject to the Federal Arbitration Act and therefore a federal question exists.   [cf. Gulfstream Aerospace Corp. v. Oceltrip Aviation 1 Pty Ltd., 31 F.4th (11th Cir. 2022)].

4.

Respondents are subject to the jurisdiction of this Court, and venue is proper against Respondents because they contractually agreed to be bound by the jurisdiction and venue of this Court by virtue of written contract dated June 15, 2019, (the "Agreement") containing a forum selection clause at page 16, paragraph 10 of the Agreement.  A copy of the agreement is attached hereto as Exhibit "A". Venue is further correct as set forth in 9 U.S.C. § 9 as the award was made in this District.

2

5.

On or about August 4, 2022 Claimant filed a demand for arbitration in Atlanta, Georgia with the American Arbitration Association against Respondents seeking to arbitrate certain disputes arising from Respondents' breach of the Agreement.  The arbitration proceeded before the American Arbitration Association, Commercial Arbitration Tribunal as AAA Case No. 01-22-0003-3283 (the "Arbitration Proceeding").

6.

Respondents having not appeared, the Arbitration was directed to be submitted and decided by documents on dates as prescribed in years 2022 and 2023, by the arbitrator, Bruce C. Bennett.

7.

On March 2, 2023, the arbitrator issued the final award (the "Award") in the Arbitration Proceeding and entered such award in favor of the Plaintiffs/Claimants and against Respondents in the amount of $126,805.75 consisting of $112,599.25 principal and interest, along with $14,206.50 and $14,206.60 attorney's fees. The arbitrator further determined that post-award interest shall accrue on the Award at a rate of 1.25% per month.  A true and correct copy of the Award is attached hereto as Exhibit "B".

8.

There have been no further proceedings in the Arbitration Proceeding and, more than three months having elapsed since entry of the Award, it is now final pursuant to 9 U.S.C. § 12.[1]

9.

Respondents have not made any payments to Claimant for any of the amounts due under the Award and the Award remains wholly unsatisfied.

10.

Pursuant to  9 U.S.C. § 9 Claimant therefore requests that this Court confirm the Award and enter a judgment in favor of the Claimants and against the Respondent for the full amount of the Award.

11.

Movant further requests an award of attorney's fees pursuant to the arbitral contract between the parties.

WHEREFORE, Claimant requests that this Court confirm the Award and enter a judgment in their favor and against Defendants/Respondents in the amount of $126,805.75 plus arbitration costs and $3,075.00 for a total amount of

---

[1] Paragraph 10 of Attachment  2 to the Agreement states the engagement letter shall be governed by NY law and also states in relevant part:  "Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof within thirty-six months after issue of the award…"  The parties' agreement to toll the limitation period is enforceable.  [cf. Photopaint Techs, LLC v. Smartiens Corp., 335 F.3d 150 (2nd Cir. 2003).]

$129,880.75, plus attorney's fees actually incurred, and further order that interest shall accrue on this amount from the date of the Award until paid at the rate of 1.25% per month.

          /S/Scott M. Stevens
         Scott M. Stevens
         Attorney for Petitioner
         Georgia Bar No. 680845

Howe Law Firm, P.C.
4385 Kimball Bridge Road, Ste 100
Alpharetta, GA  30022
678-566-6800
scott@iou.law

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NDNB ASSURANCE,
LLP,

  Claimant,
vs.

  GIGA DATA CENTER-
1 LLC (a Delaware LLC),
and GIGA DATA
CENTERS LLC, (a
Georgia LLC)

Respondents

§ § § § § § § § § § § § § § §

CIVIL ACTION FILE
NO. _____

## CLAIMANT'S BRIEF IN SUPPORT OF MOTION TO CONFIRM ARBITRAL AWARD

COMES NOW, NDNB ASSURANCE, LLP, (Plaintiff in the above-styled action but hereinafter sometimes referred to as "Movant") and files this its Motion to Confirm Arbitral Award as to GIGA DATA CENTER-1, LLC., (a Delaware LLC), and GIGA DATA CENTER LLC, (a Georgia LLC), (Respondents in the above-styled matter) and shows the following:

6

Movant files this Motion to Confirm Arbitration Award pursuant to 9 USC §

9, which states:

§ 9. Award of arbitrators; confirmation; jurisdiction; procedure

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title [9 USCS §§ 10, 11]. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.

The Federal Arbitration Act ("FAA") favors confirmation of arbitration

awards which is usually "routine or summary."   See Cat Charter, LLC v.

Schurtenberger, 646 F.3d 836, 842, 843 (11th Cir. 2011).  The presumption is

arbitral awards will be confirmed.  See AIG Baker Sterling Heights, LLC v. Am.

Multi-Cinema, Inc., 508 F.3d 995 (11th Cir. 2007). Also see Visionary v. Bank

Ozk, 2025 U.S. Dist. LEXIS 163014 (ND Ga 2025).   "As stated in Section 9 of

the FAA provides that, upon application of any party to the arbitration, the

court *must* confirm the arbitrator's award unless it is vacated, modified, or corrected in accordance with sections 10 and 11 of the statute. 9 U.S.C. § 9." Frazier v. Citifinancial Corp., LLC, 604 F.3d 1313, 1321 (11th Cir. 2010).

As the FAA applies in this matter, (cf. Gulfstream Aerospace Corp. v. Oceltip Aviation 1 Pty Ltd, 31 F.4[th] 1323, (11th Cir. 2022)), the arbitration award should be confirmed.

WHEREFORE, Claimant requests that this Court confirm the Award and enter a judgment in their favor and against Defendants/Respondents in the amount of $126,805.75 plus arbitration costs and $3,075.00 for a total amount of $129,880.75, plus attorney's fees actually incurred, and further order that interest shall accrue on this amount from the date of the Award until paid at the rate of 1.25% per month.

/S/Scott M. Stevens
Scott M. Stevens
Attorney for Petitioner
Georgia Bar No. 680845

Howe Law Firm, P.C.
4385 Kimball Bridge Road, Ste 100
Alpharetta, GA  30022
678-566-6800
scott@iou.law

8

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date served a copy of the foregoing on the

parties listed below by depositing same in the STATUTORY OVERNIGHT

DELIVERY with adequate postage thereon, to:

GIGA DATA CENTERS,
John R. Ring, Jr. Registered Agent
4455 Lower Roswell Road, Unit 682916
Marietta,  GA  30068

GIGA DATA CENTER-1 LLC
Capitol Services, Inc.,
Registered Agent,
108 Lakeland Avenue
Dover, DE  19901              (will also be served by Marshal pursuant to 9 USC

            § 12)

This    8th    day of January 2026.

                        /S/Scott M. Stevens
                        Scott M. Stevens
                        Attorney for Plaintiff
                        Georgia Bar No. 680845

## CERTIFICATE OF SERVICE

This is to certify that I have this date served a copy of the foregoing on the

parties listed below by depositing same in the STATUTORY OVERNIGHT

DELIVERY with adequate postage thereon, to:

GIGA DATA CENTERS, LLC
John R. Ring, Jr. Registered Agent
4455 Lower Roswell Road, Unit 682916
Marietta,  GA  30068

GIGA DATA CENTER-1 LLC
Capitol Services, Inc.,
Registered Agent,
108 Lakeland Avenue
Dover, DE  19901                    (will also be served by Marshal pursuant to 9 USC

§ 12)

This __8th__ day of January 2026.

                                    _/S/Scott M. Stevens_____
                                     Scott M. Stevens
                                     Attorney for Plaintiff
                                     Georgia Bar No. 680845

EXHIBIT "A"

# ⬛NDNB

**June 5, 2019.**

**Jake Ring, President & CEO**
**GIGA Data Centers LLC**

**HQ location:**
**971 St. Lyonn CTS, Suite 200**
**Marietta, GA 30068**

**Physical location:**
**1035 Mecklenburg Hwy**
**Mooresville, NC 28115**

jake.ring@gigadatacenters.com
**T  800-301-7436**
**M 678-995-4346**

### RE: Engagement Letter - Professional Appointment & Reservation of Time for System (Service) Organization Controls (SOC) Attestation

**GIGA Data Centers LLC (GIGA):**

We ("**NDNB Assurance, LLP**" or hereafter as **"NDNB," "us," "we," or "our," or "Service Auditor"**) are pleased to confirm our understanding of the professional attest services we are to provide for **GIGA Data Centers LLC** (hereafter **"GIGA," "you," "your," or the "Service Organization"**). Based on GIGA's acknowledgement and agreement to this engagement letter (and the representations and responsibilities of same as noted within this engagement letter for an agreed fee structure) and therefore retain **NDNB** such that **NDNB** will reserve and allocate professional time and/or resources as a professional appointment over the schedule of time as represented in Attachment 3 for **SOC (System [Service] Organization Controls [AT 101]) Framework** services covering the relevant and applicable criteria from the Trust Services Prin**ciples / Criteria** (as may be hereafter referred to as either "Trust Services" or "TSP/Cs" [as specifically represented in **Attachment 3** or as otherwise mutually agreed and identified herein and/or hereafter in writing for the subject matter scope and timing]).

We will examine GIGA's (service organization) description of its basic Data Center Operations (hereafter the "system"), throughout the date(s) / period (s) as represented in Attachment 3 based on the criteria set forth in [DC 200, *2018 Description Criteria for a Description of a Service Organization's System in a SOC 2 Report* OR DC 200A, *2015 Description Criteria for a Description of a Service Organization's System in a SOC 2 Report*] (description criteria as represented in Attachment 3), and the suitability of the design and operating effectiveness of the controls included in the description throughout the period as represented in Attachment 3 to provide reasonable assurance that the service organization's service commitments and system requirements were achieved based on the

applicable trust services criteria as represented in <u>Attachment 3</u>] set forth in [TSP 100, *2017 Trust Services Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy* OR TSP 100A, *Trust Services Principles and Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy (2016)*] (applicable trust services criteria), as stated in the description.

The objectives of our examination are to—

1) obtain reasonable assurance about whether, in all material respects—

   a) the description presents the system that was designed and implemented throughout the period(s) as represented in <u>Attachment 3</u>, in accordance with the description criteria.

   b) the controls stated in the description were suitably designed throughout the period as represented in <u>Attachment 3</u> to provide reasonable assurance that the service organization's service commitments and system requirements would be achieved based on the applicable trust services criteria if its controls operated effectively throughout that period.

   c) the controls, which were those necessary to provide reasonable assurance that the service organization's service commitments and system requirements were achieved based on the applicable trust services criteria, operated effectively throughout the period as represented in <u>Attachment 3</u>.

2) express our opinion in a written report about the matters referred to in this paragraph.

Our examination will be conducted in accordance with attestation standards established by the <u>American Institute of Certified Public Accountants</u> (AICPA). Accordingly, it will include examining, on a test basis, your records and other procedures to obtain evidence necessary to enable us to express our opinion, in all material respects, about whether (1) the description presents the system that was designed and implemented throughout the period as represented in <u>Attachment 3</u> in accordance with the description criteria, (2) the controls stated in the description were suitably designed throughout the period as represented in <u>Attachment 3</u> to provide reasonable assurance that the service organization's service commitments and system requirements would be achieved based on the applicable trust services criteria if the controls operated effectively throughout that period, and (3) the controls tested, which were those necessary to provide reasonable assurance that the service organization's service commitments and system requirements were achieved based on the applicable trust services criteria, operated effectively throughout the period as represented in <u>Attachment 3</u>. If the description indicates that certain service commitments and system requirements based on the applicable trust services criteria specified in the description can be achieved only if complementary user entity controls contemplated in the design of GIGA's controls are suitably designed and operating effectively, along with related controls at the service organization, we will not evaluate the suitability of the design or operating effectiveness of such complementary user entity controls.

The description is prepared to meet the common needs of a broad range of report users and may not, therefore, include every aspect of the system that individual users may consider important to meet their informational needs. There are inherent limitations in the

effectiveness of any system of internal control, including the possibility of human error and the circumvention of controls. Because of their nature, controls may not always operate effectively to provide reasonable assurance that the service organization's service commitments and system requirements are achieved based on the applicable trust services criteria. Also, the projection to the future of any conclusions about the suitability of the design and operating effectiveness of controls is subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with policies or procedures may deteriorate.

Generally, this engagement will be conducted with in accordance with, or guidance from, the AICPA's System (Service) Organization Controls Framework as referenced above and as may include *AT (Attest Engagements)* Section 101, *AT-C (Examination Engagements)* Section 105, 205, 320, (*and other relevant or legacy sections* [or authority as amended] *as may be deemed applicable* [such as AT sections 201, 601, & 801, et al; Statement on Standards for Attestation Engagements (SSAE) No. 16 & 18; AND AU sections 324 & 561] *by NDNB for purposes of conducting this/these Attestation[s]*), for System / Service Organizations or successor and/or substitute standards (*including* SSAE / ISAE) as deemed appropriate and applicable by **NDNB** with consideration to the AICPA, PCAOB (the Public Company Accounting Oversight Board), CICA (Canadian Institute of Chartered Accountants), or relevant public accounting regulatory body and standards.

## ENGAGEMENT SERVICES

The services to be provided within this engagement letter require the relevant, timely, complete, and accurate participation of the Service Organization (as further discussed herein, inherent to an attestation function, and/or as designated in Attachment 1). Further, the timing of the evidence and documentation (the essence of timing therewith) is important to the representations made by the Service Organization. These assessment activities will be performed in accordance with attestation standards and Trust Services established by the AICPA for Service Organization Controls. Those standards require that we plan and perform the assessment to obtain a reasonable basis for rendering an opinion. An assessment of the description of internal control structure policies and procedures and tests of operating effectiveness include inquiries of service organization personnel, reference to various forms of documentation, inspection of documents and records maintained by the service organization, observations, corroborative inquiries and re-performance of relevant tasks and/or policies and procedures. We expect that our assessment may provide a reasonable basis for our report and an opinion therewith provided that we receive adequate participation and information useful to the intended purposes of this engagement.

Specifically, we will perform attestation procedures to obtain reasonable assurance about whether (1) management's description of the service organization's system presents fairly, in all material respects, the system that was designed and implemented throughout the period, based on the criteria in Management's Assertion; (2) the controls included in the description were suitably designed throughout the period to provide reasonable assurance that the Trust Services criteria related to the mutually agreed and relevant Trust Services criteria would be met if the controls operated effectively; and (3) such controls were operating effectively throughout the period to meet the mutually agreed and relevant Trust Services criteria.

In addition to the procedures we consider necessary to render our opinion as expressed in the previous paragraph, we will apply tests to specific controls to obtain evidence about their effectiveness in meeting the relevant Trust Services (and criteria thereof) during the test date(s)

and/or test period(s) provided within this engagement letter as may be represented in this engagement letter, or other mutually agreed for the applicable test date(s) and/or test period(s). Our assessment will include **GIGA's** operations in **Mooresville, NC,** as may be identified herein (and by **NDNB** as relevant) as in scope, along with technology facilitating this location in the virtual environment and will NOT include procedures to evaluate the effectiveness of policies and procedures at individual user organizations.

We will perform an assessment of management's assertion in relation to requested, established, or stated criteria. Accordingly, we will perform such procedures as we consider necessary to evaluate management's assertion in relation to the requested, established, or stated criteria for purposes of expressing an opinion on the respective assertion. **NDNB**'s assessment of management's assertion regarding a control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. The design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Further, because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, have been detected. These inherent limitations may include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Controls may also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Projections of any evaluation of controls effectiveness to future periods are subject to risks. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures. The services in this engagement letter were NOT designed to provide assurance on specific internal controls or to identify significant deficiencies or material weaknesses within the control environment. Furthermore, the services that we will perform are NOT designed and cannot be relied upon to disclose errors, fraud, or illegal acts, should any exist. However, we will inform the appropriate level of management of any material weaknesses that come to our attention and any fraud or illegal acts that come to our attention, unless they are clearly inconsequential.

Our attestation will be conducted in accordance with the relevant U.S. and/or internationally accepted attesting standards and practices and will include procedures we consider necessary to enable us to express such an opinion. The attestation standards require that we perform our assessment engagement only if we have reason to believe that management's assertion is capable of evaluation against criteria that are suitable and available to users. We will notify you if, in our judgment, management's assertion does not meet the foregoing presentation standards. In such event, you will either need to modify management's internal control assertion, to comply with the foregoing presentation standards, or we may be required to withdraw from the engagement or decline to issue a report. If a completed and issued opinion is other than unqualified, we will discuss the reasons with you in a candid manner without formal written documentation of the basis. If, for any reason, we are unable to complete the attestation, or are unable to form, or have not formed an opinion, we may decline to express an opinion, or to issue any report (with non-issuance being self-evident from the lack of an auditor's opinion provided) as a result of this engagement or the lack of participation by the Service Organization. Further, scope limitations or the failure of the Service Organization to provide adequate, relevant, complete, accurate, and/or timely information and evidence (or otherwise participate) as a basis for an assertion (and/or the attestation therewith) may dictate that a disclaimer opinion will or must be issued (and the Service Auditor ultimately reserves the professional and ethical professional right to decline to

issue a report of any sort as referenced above). The withdrawal, abandonment, or termination of the engagement by Service Organization during the process of (or proximate therewith) a described test date or period within this engagement letter will dictate that the report for such test date or period will be deemed to have been completed (and include a disclaimer of opinion) by the Service Auditor and such report will be deemed as issued by the Service Auditor despite the failure of the Service Organization to complete the process or to receive any report. In the event that the Service Organization does not participate or does not complete relevant efforts within nine months of the test (validation) date (for a Type One) or the end of the respective test period(s) (for a Type Two) as identified in in this engagement letter, then the Service Auditor shall be deemed to have completed the attest function (and to have completed the reserved and allocated time therewith) despite any other facts or circumstances in which the Service Auditor did not issue, was precluded from issuing, or declined to issue an auditor's opinion.

If circumstances arise relating to the condition of **GIGA**'s records, the availability of appropriate evidence, or indications of a significant risk of material misstatement of management's internal control assertion because of error or fraud that, in our professional judgment, prevents us from completing the engagement or forming an opinion or issuing our report, we retain the unilateral right to take any course of action permitted by professional standards, including declining to express an opinion or issue a report, or withdrawal from the engagement.

The services in this engagement letter are to be conducted by **NDNB** as an independent auditor and as such **NDNB** is not an advocate for the Service Organization. Any assertion to the contrary of the role of **NDNB** as an independent party shall be regarded as a breach of the terms of this engagement letter. In a more limited context, our professional standards MAY require that we perform certain additional procedures, on current and previous years' engagements, whenever a partner or professional employee leaves the firm AND is subsequently employed by or associated with the Service Organization. Accordingly, **GIGA** agrees it will compensate **NDNB** for any additional costs incurred as a result of **GIGA**'s actions that compromise the independence of **NDNB** specifically including the employment of a partner or professional employee of **NDNB** or an affiliate audit firm thereof.

Our services are provided by our professional audit professionals and affiliated non client-facing back-office administrative team. From time to time and depending upon the circumstances, and in situations where we are presented with highly technical information, we may use third-party expert service providers to assist us in providing professional services to you. In such circumstances, it may be necessary for us to disclose confidential client information to them. We enter into confidentiality agreements with all third-party service providers and we are satisfied that they have appropriate procedures in place to prevent the unauthorized release of your confidential information to others.

Because **NDNB** shall rely on **GIGA** and its management to discharge its responsibilities as represented in this engagement letter and the relevant attestation standards, **GIGA** holds harmless and indemnifies **NDNB** and its partners and employees from all claims, liabilities, losses, and costs arising in circumstances where there has been a known misrepresentation by a member of **GIGA** management that has caused, in any respect, **NDNB**'s breach of contract and/or negligence, et al. This provision will survive termination of this letter.

You understand that our report, including the description of tests of controls and results thereof, is intended solely for the information and use of **GIGA**; user entities of **GIGA**'s system during some or all of the period as represented in <u>Attachment 3</u>; business partners of GIGA subject to risks arising from interactions with the system, practitioners providing services to such user entities and business partners, prospective user entities and business partners, and regulators who have sufficient knowledge and understanding of the following:

- The nature of the service provided by the service organization.

- How the service organization's system interacts with user entities, business partners, subservice organizations, and other parties.

- Internal control and its limitations.

- Complementary user entity controls and how those controls interact with the controls at the service organization to achieve the service organization's service commitments and system requirements.

- User entity responsibilities and how they affect the user entity's ability to effectively use the service organization's services to meet the applicable trust services criteria.

- The applicable trust services criteria.

- The risks that may threaten the achievement of the service organization's service commitments and system requirements and how controls address those risks.

You also understand that the report is not intended to be, and should not be, used by anyone other than these specified parties.

## MANAGEMENT'S RESPONSIBILITIES

As you know, the description of the system, including the internal control structure, policies, and procedures at **GIGA** is the responsibility of management. Management is responsible for providing us with a written management representation letter confirming certain representations made during the course of the engagement. Management is responsible for identifying and ensuring that the entity complies with the laws and regulations applicable to its internal control assertion, and for informing us about all known relevant and/or material violations of such laws or regulations. Management has the primary responsibility for the description of the system that was designed and implemented throughout the period, based on the criteria in management's assertion.

**GIGA** agrees that it will NOT include our reports, or otherwise make reference to us, in any public or private securities offering without first obtaining our consent. Any request to consent is also a matter for which separate arrangements will be necessary. After obtaining our consent, **GIGA** also agrees to provide **NDNB** with printer's proofs or masters of such offering documents for our review and approval before printing, and with a copy of the final reproduced material for our approval before it is distributed.

The assistance to be supplied by your personnel, including the preparation of the description of internal control structure policies and procedures and control objectives, has been and/or will be

discussed and coordinated with **Jake Ring, President & CEO** and/or the **Management of the Service Organization,** ("management") or the representative(s), surrogate(s), designate(s), or successor(s) thereof. Management understands that, while the preparation of the control descriptions, control specifications, or control objectives are management's responsibility, our engagement may include assistance to you in updating these items. The timely completion of this work will assist us in performing our work efficiently.

**GIGA** is responsible for the system, design, and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the company involving (a) management, (b) employees who have significant roles in internal control, and (c) other instances or potential instances where the fraud could have a material effect on the financial statements and thus the related controls.

**GIGA** is also responsible for informing us of your knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators, or others. In addition, you are responsible for identifying and ensuring that the entity complies with applicable laws and regulations. The details of the responsibilities of management are further discussed in **Attachment 1 & 2** to this document and are therefore a part of this document and agreement without exception.

At the conclusion of our engagement, we may require certain written representations from you about the attestation and related matters prior to, or coinciding with, issuance of the attestation report. **GIGA** is responsible for both the making of all relevant financial and operational records and related information available to us and for the accuracy and completeness of that information, assertion/attestation evidence, and work-papers provided within the engagement(s).

**Management's Assertion on Controls**
Based on the descriptions provided by Management, the Management of **GIGA** shall assert, as may be properly modified by the description and the scope of the engagement, that:

The Management of **GIGA** has or will prepare the description of the system for the test date(s)/period(s) within this engagement letter (as represented in this engagement letter), or other mutually agreed testing period, based on the criteria for a description of a service organization's system as discussed / described in the AICPA Guide *Reporting on Controls at a Service Organization Relevant to Security, Availability, Processing Integrity, Confidentiality, or Privacy* [as amended, revised, updated, or (re)interpreted]. (**GIGA**'s description of the system will include the relevant criteria from the applicable Trust Services (as represented in this engagement letter or as otherwise mutually agreed and identified herein and hereafter in writing). The description is intended to provide users with information about **GIGA's** system, particularly system controls intended to meet the criteria for the mutually agreed and relevant Trust Services set forth in *Trust Services Principles (and) Criteria, and Illustrations for Security, Availability, Processing Integrity, Confidentiality, and Privacy* (AICPA, *Technical Practice Aids*) [as amended, superseded, revised, interpreted, updated, realigned, and/or reinterpreted, et al].

## CLIENT RECORDS & ASSISTANCE

The working papers prepared in conjunction with this engagement are the property of **NDNB**, constitute confidential information, and will be retained by us in accordance with **NDNB**'s policies and procedures. However, we may be required under the rules or regulations of the AICPA, SEC, PCAOB, et al, and, if applicable, equivalent regulators in countries other than the

United States to make our working papers available to them in connection with any compliance inspection.

The documentation (including any attest work-papers, memorandum, templates, checklists, audit programs, and/or other intellectual property of **NDNB**) for this engagement is/are/shall be the exclusive property of **NDNB** and constitutes the confidential information of **NDNB** (or the confidential information of related parties, other third-parties [if applicable], or for other clients of **NDNB** in certain circumstances). However, **NDNB** may be requested to make certain documentation available to government agencies (or other relevant parties) under subpoena or other means compelled by a court of proper jurisdiction pursuant to authority given to them by law. Absent a proper court order, subpoena (et al), issued by a competent court or judge, **NDNB** will consider any information within this engagement as being the exclusive property of **NDNB** (or the Service Organization, if determined and deemed so by **NDNB**) to be protected as a matter of this agreement and/or under the relevant accountant-client privilege [as described under Ga. Code Ann. § 43-3-32 and/or Fla. Stat. Ann. §§ 90.5055 and 473.316, or other citation depending on the location of the subject matter documentation] and/or as **NDNB**'s exclusive property and non-discoverable whether or not **NDNB** (for itself or an affiliate, surrogate, successor, et al) is a party to the matter.

In the event we are requested or authorized by **GIGA** or are required (as referenced above) by government regulation, subpoena, or other legal process to produce our documentation or our personnel as witnesses with respect to our engagements for **GIGA**, **GIGA** will, so long as we are not a party to the proceeding in which the information is sought, reimburse **NDNB** for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such requests.

During the course of our engagement, we may accumulate records containing information and/or data from **GIGA** that should be reflected in **GIGA** files, books, and records. **GIGA** will determine that all such information and/or data, if necessary, will be so reflected in **GIGA**'s files, book, and records regardless of the information or data provide to **NDNB**, or format thereof. Accordingly, **GIGA** will NOT expect **NDNB** to maintain copies of such records in our possession for any purposes, including but not limited to, the completion or augmentation of files, books, and/or records or for any expected or unknown litigious matters for, against, or with the Service Organization (or related parties). **NDNB** does not extend the represented services or collection of records as part of any litigation affairs or expert witness activities of/with/for the Service Organization.

## ENGAGEMENT TERMS & CONDITIONS

Our annual agreed fixed base non-accountable fee structure for the reserved and allocated time (and resources therewith) as represented in this engagement letter for the herein described SOC Attest activities will be as represented and scheduled in **Attachment 3** of this engagement letter.

Since this (or these) engagement(s) and the attest services therein (and/or any part[s] thereof) are specifically agreed to be annual fixed base non-accountable fee amounts, the Service Auditor shall NOT be required by the Service Organization or any other party to produce time and/or billing information, time summaries, hourly details, or any other time reports or other details thereof in order to validate (i) any allocated, reserved, rendered, lapsed, exercised, expended, performed, or completed time and/or resources; (ii) the completion of services; or (iii) any reports

or other (general or specific) justification of any time allocated, reserved, rendered, lapsed, exercised, expended, performed, or completed under this engagement letter (and/or any part[s] thereof); in order to validate the agreed fees for any general or specific date(s) or period(s) relevant to, or as represented within, this engagement letter. It is acknowledged and the representation of the Service Organization that they will participate and perform timely for the test date(s)/period(s) of appointment as referenced within this engagement letter and the failure of the Service Organization to timely participate and perform shall not impeach the validity of any agreed fees due as represented herein.

Administration, travel, and other ordinary out-of-pocket costs (within the USA) such as document production, word processing, postage, etc. will be invoiced at a summary non-accountable fixed fee amount per annum of $900 (nine hundred dollars) or as may be otherwise separately represented in this engagement letter. Travel outside the USA (if necessary/as needed) will be separately invoiced at the actual time involved and amounts incurred and any on-sight activities unless separately agreed.

Unless otherwise designated in this engagement letter or a subsequent written agreement for services, you will be separately billed at a blended standard rate of $360 (three hundred sixty dollars) per hour for any changes to the scope of the engagement, scope or activities requiring on-site (at client location or sub-service organization[s]) fieldwork of more than 10 hours, limitations on (or specifically requested) fieldwork dates, changes to agreed fieldwork dates and/or associated travel plans, advice with remediation efforts, any policy and/or procedure templates for control environment documentation provided (or assistance and/or editing therewith), guidance with internal auditing functions, extra-ordinary expenses incurred, special requests you have made during the engagement, or the supervisory team management of the activities of the Service Organization's description of controls, assertion, and reporting process(es).

The services described in this engagement letter may be dependent upon the arrangement of other related compliance services, or pre-attest activities, due diligence, or similar and/or related regimens depending upon the facts and/or circumstances including but not limited to an Initial SOC Scoping Overview and/or control environment pre-screen at an agreed fee of $1,800 (one thousand eight hundred dollars) as may be invoiced by a separate but affiliated party (of the Service Auditor or designate thereof) or other recommended participating party under the same payment terms of this agreement. Additional fees and expenses may be charged to **GIGA** at a blended standard rate of $360 (three hundred sixty dollars) per hour for inclusion of: (i) any sub-service activities, business process(es), and/or organization(s); (ii) operations outside the United States (48 contiguous states); OR (iii) engagement scope specifically requiring further assessment activities and/or fieldwork.

We require an upfront retainer for the SOC engagements of **50%** (fifty percent) prior to the beginning of the attestation (unless otherwise reflected in a structured time schedule or a schedule commensurate with the relevant test period) which will be applied to the conclusion of the engagement. Otherwise, our invoices may be rendered commensurate with (i) the schedule of reserved or allocated time and/or resources for the engagement activities, (ii) devoted time and/or progress of services for the relevant test date and/or period activities which may occur sooner than scheduled, OR (iii) other requested/added time and/or services are included, and are payable upon presentation per the terms in Attachment 2. In accordance with our firm policies, or progress may be suspended if your invoice(s) and account becomes forty-five days or more

overdue and will not be resumed until your account is paid in full. Suspension of these services by **NDNB** for late and/or non-payment by **GIGA** does NOT terminate this engagement letter or any terms within this engagement letter.

If **NDNB** elects to terminate the services for reasons of non-payment, the engagement(s) will be deemed to have been completed upon written notification of termination, even if we have not completed the reserved, allocated, or expended time, fieldwork, or any final report. **GIGA** will be obligated to compensate **NDNB** for all time reserved, allocated, expended, and/or utilized at a blended standard rate of $360 (three hundred sixty dollars) per hour (not to exceed any fixed designated and/or agreed fees represented in this engagement letter) and to reimburse us for all relevant out-of-pocket expenditures through the date of a requested or effective termination or as otherwise indicated herein. The details of the billing and dispute settlement are further discussed in **Attachment 1 & 2** to this document and are therefore a part of this document and agreement without exception.

In the event of delayed reporting related to the subject matter of this engagement letter by the Service Organization, there shall be a fee increase of $1,500 (one thousand five hundred dollars) per month (or part thereof) for the greater of either (i) a report test date/period ending more than three months after the agreed test date/period as noted in Attachment 3 for the initial year (2019) reporting, or more than two months after the agreed test date/period as noted in Attachment 3 for any respective subsequent reporting year (post-2019), **OR** for (ii) each month of associated engagement activities and/or fieldwork dates performed more than four months after the agreed test date/period for the initial reporting year (2019) as noted in Attachment 3, or more than three months after the agreed test date/period as noted in Attachment 3 for any respective subsequent reporting year (post-2019).

Timeliness and relevance of our collected work-papers are important for the documentation of **NDNB**'s professional services related to SOC reporting. In the event that **GIGA** does not make substantial and/or timely advances and efforts towards completion of the services contained herein prior to the **November 30th** immediately following the initial designated reporting year's (2019) test date/period and **October 31st** immediately following the subsequent reporting year's (post-2019) test date/period(s) as represented in this engagement letter, then **NDNB** will have the right to terminate this engagement and retain amounts for the services and/or hours rendered to date plus a termination fee of $8,000 (eight thousand dollars).

This letter (and its attachments) constitute(s) the complete and exclusive statement of agreement between **NDNB** and **GIGA** superseding all proposals oral or written and all other communication, with respect to the terms of the engagement between the parties. Any auditor's report issued as a result of this engagement letter will be solely for the internal use of the management of **GIGA,** the properly authorized User Organizations, and the proper engaged auditors of User Organizations as may be further discussed in **Attachment 2** or the applicable attest standards. Any failure of **NDNB** to enforce any of the terms of this agreement shall NOT be considered a waiver of the right to enforce them. Amounts reflected within this engagement letter are to be paid in United States of America (USA) dollars unless otherwise agreed (in writing) in another national currency, a crypto-currency, or gold and/or silver bullion coins from the Australian, Austrian, USA, United Kingdom, or the Royal Canadian Government Mints.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Very truly yours,

# NDNB Assurance, LLP

<u>ACKNOWLEDGEMENT & RESPONSE BY A RESPONSIVLE PARTY WITH THE SERVICE ORGANIZATION:</u>  This letter correctly sets forth the understanding of <u>GIGA.</u>

IF YOU ARE ENTERING INTO THIS AGREEMENT ON BEHALF OF A COMPANY OR OTHER LEGAL ENTITY, YOU REPRESENT THAT YOU HAVE THE LEGAL AUTHORITY TO BIND SUCH ENTITY AND ITS CORPORATE RELATED ENTITIES TO THESE TERMS AND CONDITIONS, IN WHICH CASE THE TERMS "YOU" OR "YOUR" SHALL REFER TO SUCH ENTITY AND ITS CORPORATE RELATED ENTITIES. IF YOU DO NOT HAVE SUCH AUTHORITY, OR HAVE MADE A MISREPRESENTATION ABOUT THE COMPANY OR OTHER LEGAL ENTITY'S INTENTION OR ABILITY TO PERFORM OR PARTICIPATE WITHIN THIS AGREEMENT, THEN THE SIGNATORY SHALL BE PERSONALLY LIABLE FOR THIS AGREEMENT.

Legal Name of Service Organization    *GIGA DATA CENTER-1 LLC*

(The Name of the) State of Incorporation/Organization    *DELAWARE*

Officer Signature    *[signature]*    Title    *CEO*

Print Name    *JOHN R. ("JAKE") RING JR.*    Date    *6/15/2019*

a Responsible Party's Signature is also required on **Attachment 3**

vf 06-05-2019

Please send this executed document to our Administrative Services location:

| Regular U.S. Mail | or | Physical / FedEx / UPS Delivery |
|---|---|---|
| NDNB | | NDNB |
| P.O. Box 29130 | | 2897 N. Druid Hills Road NE |
| Atlanta, Georgia 30359 | | Suite 355 |
| | | Atlanta, Georgia 30329 |

Enc.

Included Hereafter & Herein:

> **Attachment 1:** Additional Service Organization's Responsibilities
> **Attachment 2:** Billing, Legal, & Arbitration Terms
> **Attachment 3:** Engagement Pricing for Schedule of Attest Services

# Attachment 1

## *Additional Service Organization's Responsibilities*

The SOC Framework and related Standards define specific responsibilities that will be assumed by the Service Organization's management during this engagement. The Service Organization responsibilities assumed by the Service Organization include, but are not necessarily limited to, the following:

1. The Service Organization is responsible for determining which services, business units, functional areas, or applications the Service Auditor will be engaged to report on, and for providing this information in its description(s). Further, the Service Organization's management is responsible for the overall system, the design thereof, and the appropriateness of the Trust Services, regulatory regimens and standards, and/or control objectives, (including any associated specifications and/or criteria thereof) to be represented and achieved over the processing of transactions of user organizations.

2. The Service Organization's management is responsible for the timeliness of activities included in this engagement letter including both the timing of services described within this engagement letter and the associated assertion and/or attestation evidence presented to the Service Auditor as part of the activities in this engagement letter. The Service Auditor maintains the right to independence of these considerations in order reserve the position to provide an independent auditor's report as envisioned in this engagement letter. Delays or suspension of activities by the Service Organization may cause considerations or concerns for the Service Auditor's Report, the opinion provided therein, or the issuance of a timely report. Since the(se) services within this engagement letter constitute an attestation (or "assurance" or "audit") function, the duty to perform lay with the Service Organization with regard to the information to be provided and the activities required to be completed – and to complete - the attest functions included within this engagement letter (in order to maintain auditor's independence, amongst other considerations). For purposes of this engagement letter, the terms within, the applicable attest standards, and the independence of the Service Auditor, the Service Organization is compensating the Service Auditor for the professional services time reserved, allocated, and/or expended and is therefore specifically NOT paying for the issuance of any completed SOC report or any opinion as may be contained therein.

3. The Service Organization's management is responsible for establishing and maintaining an effective internal control system, record keeping, and for making available to the Service Auditor all records and related information and personnel of relevance to the inquiries being made, along with other relevant and related management functions for purposes of this engagement. An effective internal control system reduces the likelihood that errors or irregularities will occur and remain undetected; however, it does not eliminate that possibility. As fundamental aspect of these services, the Service Organization's management understands the Service Auditor's work does NOT guarantee that errors or irregularities will not occur and the Service Auditor's activities may NOT detect errors and irregularities should they have occurred. Moreover, the Service Organization's management is responsible for (i) providing an assertion about the fairness of the presentation of the description and suitability of the design (for a type one) of the system (with the controls thereof) AND the operating effectiveness of the controls (for a type two) to achieve the applicable TSP/Cs or other included control objectives, specifications, or criteria in order to achieve any expected goals including the preparation of the description(s) as a basis of the assertion(s) and the completeness, accuracy, and method(s) of presentation thereof; (ii) selecting and/or identifying the applicable TSP/Cs

(or other included control objectives, specifications, or criteria) thereof for inclusion within the assertions(s); (iii) having a <u>reasonable basis for its assertion</u> regarding the system and the controls; (iv) <u>identifying the risks</u> that threaten the achievement of the TSP/Cs and/or control objectives stated in the description; (v) <u>designing, implementing, and documenting controls</u> that are suitably designed and operating effectively to provide reasonable assurance that the control objectives stated in the description of the service organization's system were achieved; (vi) <u>defining the Systems, Infrastructure, Software, People, Procedures, and Data within scope</u>; (vii) disclosing any <u>instances of non-compliance</u> with laws or regulations, uncorrected errors, or failures in the control environment and any subsequent events applicable to the scope of the attest function; (viii) disclosing any knowledge of any actual, suspected, or alleged intentional <u>acts by management</u> of the Service Organization or its employees <u>that could adversely affect the fairness of the presentation of management's assertion and/or description of the platform, system, or controls thereof</u> or whether the controls were suitably designed and operating effectively to meet the applicable TSP/Cs (or other included control objectives, specifications, or criteria, et al); (ix) <u>scheduling Service Organization personnel</u> (and relevant third-parties) <u>to participate within the time parameters</u> applicable to the test date(s) and/or test period(s) as identified in this engagement letter or otherwise identified in writing (including access to relevant records and documentation); and, (x) other <u>responsibilities required for the completion and issuance of a SOC Framework attestation report</u> by NDNB.

4.  The Service Organization's management is responsible for preparing the description of the system of controls including the <u>Systems, Infrastructure, Software, People, Procedures, and Data</u> within scope. The Service Organization's management is responsible for the completeness, accuracy, timeliness, and method of presentation of the overall system and description of controls, including the responsible party within the Service Organization for each control, and is also responsible for specifying the control objectives, unless a third-party establishes them. Further, the Service Organization is responsible for providing the Service Auditor with any TSP/Cs, criteria, control objectives, control specifications, scope information, and/or general feedback provided by any User Organization(s) (or known prospective Users) or the auditor's thereof, with regard to any prospective, active, or historical SOC reports issued by a prior auditor or as represented within this engagement letter. The Service Auditor may assist the Service Organization in preparing the description; however, the representations in the description are ultimately the responsibility of the Service Organization's management, without exception.

5.  The Service Organization' management understands that the assertion(s) and description(s) of the Service Organization's specific controls and the overall control environment (or any part thereof) as may be contained and represented in a final report (including the subject matter Trust Services) or as received by or during the Service Auditor's inquiries performed during the course the attestation processes and/or the produced a result thereof, represents subject matter for which the management of the Service Organization holds sole responsibility for any content thereof. This Section shall survive termination of this engagement letter.

6.  The Service Organization's management is responsible for understanding the difference between a Type 1 and a Type 2 Attestation and selecting the attest type that it believes is sufficient to achieve its purposes, as well as those of its user organizations and its user organizations' auditors. Further, the Service Organization's management is responsible for understanding the concept of test date(s) and test period(s) and selecting the test

date(s), in the case of a Type 1 Attest, or test period(s), in the case of a Type 2 Attest, that the Service Organization believes is sufficient to achieve its purposes, as well as those of its user organizations and its user organizations' auditors.

7.  The Service Organization's management is responsible for participating in a timely manner for the test dates and/or periods (and the scheduling of participation and affairs thereof with proximity to the defined test dates and/or test periods) as designated in this engagement letter. The Service Auditor will NOT be responsible for any delays resulting from the inaccessibility of these resources.

8.  The Service Organization's management is responsible for the relevant, complete, and accurate participation of and by the Service Organization personnel and providing the Service Auditor with access to appropriate Service Organization resources, pertinent systems documentation, contracts, and minutes of oversight committee meetings, and for obtaining the cooperation of relevant and/or significant third-parties and/or sub-service organizations included in the scope of the attest (during and with proximity to the defined test dates and/or test periods) for the timeframe(s) described in this engagement letter. The untimeliness and/or inaccessibility of the aforementioned may negatively impact the Service Auditor's ability to complete the review. As deemed necessary by the Service Auditor, the Service Organization may need to obtain a letter of representation from the third-party and/or sub-service organization regarding the evidential matter that will be relied upon in forming an opinion prior to the issuance of the SOC report.

9.  The Service Organization's management is responsible for disclosing to the Service Auditor any significant changes in controls that have occurred since the Service Organization's last assessment or within the last twenty (20) months if the Service Organization has not previously issued a Service Auditor's report.

10. The Service Organization's management is responsible for disclosing to the Service Auditor any illegal acts, fraud, or uncorrected errors which it is aware of that may be relevant to the scope of this assessment. Further, the Service Organization's management is responsible for disclosing to the Service Auditor any relevant design deficiencies in controls of which it is aware, including those for which management of the Service Organization believes the cost of corrective action may exceed the benefits.

11. The Service Organization's management is responsible for providing the Service Auditor with a letter of representations signed by key members of management regarding the evidential matter that will be relied upon in forming an opinion prior to the issuance of the SOC report. It may be considered a scope limitation on the review if a representation letter is not provided by management, and the Service Auditor may issue a qualified opinion, or issue a disclaimer of opinion, if the Service Organization refuses to provide a representation letter that addresses the representations required by the SOC framework.

## __Attachment 2__
### _Billing, Legal, & Arbitration Terms_

1.  Perfection of this engagement letter as a binding contract is contingent and dependent upon NDNB's completion (to NDNB's satisfaction) of NDNB's independence, due diligence, and internal client acceptance procedures with the Service Organization, NDNB's actual approval of the Service Organization as an NDNB client, and any required regulatory licensure or registration necessary for participation or completion of services relevant for the Service Organization's legal and/or physical situs (domicile) or regulated industry. Further, the Service Organization agrees with the Service Auditor that the principal physical location for purposes of subject matter within this engagement letter for regulatory matters related to the practice of public accounting and the issuance of any report(s) thereof shall be the office in North Carolina. The Service Organization is responsible for disclosing to NDNB any disagreements that the Service Organization had with a prior Service Auditor regarding an attest engagement, any services commensurate with an engagement, activities of the Service Organization, or any billings that are contested or remain unpaid at the date of this engagement letter. Further, the Service Organizations understands that this engagement letter is for independent auditor services and that the Service Auditor may represent other interests in the practice of Public Accounting as required by law, the professional standards of the AICPA, or other required regulatory standards and/or best practices as determined by NDNB (or its employees, assignees, successors, substitutes, surrogates, affiliates, et al).

2.  Payment for invoices is due within 30 days of the date of our invoice. Any claim or dispute regarding invoices presented for payment must be made within 30 days of the date of our invoice. Should any invoice remain unpaid for more than forty-five (45) days, interest and late payment collection penalties shall be paid at a rate of 1.25% each per month (or as otherwise limited by law) from the original date of the invoice or as otherwise allowed by law. A fifty dollar collection service charge will apply in the event of a returned check and/or for each monthly collection effort / attempt conducted after 90 days from the date of the original invoice. Any taxes arising out of this engagement letter other than those on NDNB's net income shall be the Service Organization's responsibility.

3.  NDNB reserves the right to determine the personnel to participate and/or perform the work, although NDNB will attempt to honor the Service Organization's requests for specific individuals if NDNB is provided with timely notification of such request.

4.  Neither the Service Organization nor NDNB shall be liable for any delays or failures to perform due to causes beyond the Service Organization's or NDNB's control.

5.  Assuming the Service Organization meets its requirements as described in the applicable attest standards AND in this engagement letter, the Service Organization shall own a perpetual, nontransferable, paid-up right and license to use the deliverables of this project for purposes of the Service Organization's internal audit purposes. Otherwise, the Service Auditor's report, subject to its usefulness for the defined test date/period(s), is generally intended for recipients included within the SOC Framework Attestation standards which include (i) the management of the Service Organization, (ii) its user organizations, and (iii) the independent auditors of its user organizations. NDNB retains all other rights in the deliverables, including the related intellectual property rights. Subject to the Service

Organization's obligations of confidentiality, the Service Organization will be free to use the concepts, techniques, and know-how used and developed in the project for purposes of the Service Organization's internal business. Subject to NDNB's obligations of confidentiality, NDNB will be free to use the concepts, techniques, and know-how used and developed in the project for purposes of performing similar services for our other clients using NDNB's general knowledge, skills, and experience. Distribution by the management of the Service Organization of the Service Auditor's report outside of the intended parties of the SOC Framework shall require the written acknowledgement of the recipient to the terms of NDNB.

6.  In connection with the project, the Service Organization and NDNB each will have access to confidential information made available by the other; each shall protect such confidential information in the same manner as it protects its own confidential information of like kind. E-mail Communication: In connection with this engagement, we may communicate with you or others via email. As emails can be intercepted, disclosed, used, and/or otherwise communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed, we cannot ensure that emails from us will be properly delivered and read only by the addressee. Therefore, we disclaim and waive any liability for interception or unintentional disclosure of email transmissions, or for the unauthorized use or failed delivery of emails transmitted by us in connection with the performance of this engagement.

7.  NDNB (including its successors, assignees, substitutes, surrogates, or affiliates, et al) shall NOT be liable to the Service Organization in any case for more than the most recent year's fees that were paid by the Service Organization under this engagement letter. Further, as an independent auditor, NDNB will not be liable for consequential or punitive damages (*including lost profits or savings*) even if aware of their possible existence.

8.  NDNB's work and related findings and recommendations were limited to the specific scope and specific areas covered in this engagement letter and are not intended to identify every weakness and vulnerability within the Service Organization's systems. Accordingly, NDNB does NOT express any opinion on the internal control structure or processing procedures of the Service Organization's information systems environment taken as a whole or other than the specific purposes stated within this engagement(s).

9.  The Service Organization will indemnify NDNB against any damage or expense that may result from any third-party claim relating to NDNB's services or any use by the Service Organization of any work product and/or report, and the Service Organization will reimburse NDNB for all expenses (including counsel fees) as incurred by NDNB in connection with any such claim, except to the extent such claim is finally determined by a court of law to have resulted from act of fraud by NDNB. The indemnity clause and related provisions and information above shall survive any termination of this engagement letter.

10. Any controversy or claim arising out of, or relating to, the appointment of time and professional services included in this agreement, the continuation of services, or any breach thereof, shall be settled by arbitration to be held in Atlanta, Georgia, (Dekalb County [venue]) in accordance with the current Commercial Arbitration Rule of the American Arbitration Association (AAA) using the most expedited rules of AAA regardless of the amount(s) due. This engagement letter and the activities contained

within shall be governed by and construed in accordance with the laws of the State of New York unless otherwise specifically stated within this letter or in writing and signed by both parties. Process Service shall be made to the AAA by simply filing the demand for arbitration and use of the address shown on page 1 of this engagement letter for the Service Organization and as shown on the signatory page for physical delivery to Service Auditor. A Service Organization outside the USA shall be deemed served by way of email. An arbitrator with specific knowledge of auditing and public accounting shall be selected and appointed by the Service Auditor from the metro area of the arbitration location. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof within thirty-six months after issue of award, or later if allowed by law. Failure of the Service Organization to timely acknowledge the agreement for arbitration within 30 days in the event of a controversy shall deem such right and privilege of the Service Organization to be voidable by the Service Auditor and any existing dispute may be further resolved by the Service Auditor in arbitration or being held in Atlanta, Georgia, (Dekalb County [venue]). If applicable, any matter related to a billing delinquency or failure of the Service Organization to pay any amounts due with respect to his engagement letter or related matters shall be resolved in arbitration or in the small claims tribunal (or applicable lawful court relevant for the disputed amount) of the designated venue. Any action against NDNB (or a party, participant, and/or surrogate of or with NDNB, or a successor to NDNB, et al) must be brought according to the terms represented herein and within the earliest of: (i) six (6) months after the date of the final management representation letter supplied by NDNB to the Service Organization for execution at the conclusion of the attest (if both executed and applicable to the engagement assuming a report was issued); (ii) six (6) months from the applicable test (validation/"as of") date (in the case of a type one report) or the last date of the applicable test period (in the case of a type two report); (iii) six (6) months from the date the cause of action arises; or (iv) two (2) months after the engagement is requested to be (or initially proposed to be) terminated by the Service Organization or by the Service Auditor. The prevailing party shall be awarded applicable attorney's fees. This requirement for arbitration and the related provisions and information above are agreed to be part of the basis of the bargain for the services and the stated fees within this engagement letter and shall survive any termination of this engagement letter.

11. Although this engagement letter provides for and designates NDNB as the Service Auditor with the exclusive right to perform the proximate services as described or referenced herein for the time and resources reserved, allocated, and/or utilized for years identified in in this engagement letter, Service Organization agrees that if for any reason during the context of, or conclusion of, this engagement letter or the engagement itself, NDNB may issue or re-issue the report(s) by either assignment of status as Service Auditor or simply as a surrogate for this engagement under another professional name, fictitious name, alias, a related-party CPA firm alliance member, successor firm name, interim name, or another "Service Auditor" firm name other than NDNB, or a firm other than NDNB (including but not limited to NDB ASSURANCE LLP; NDB ACCOUNTANTS & CONSULTANTS LLP; or BAMBECK, NICKELL, & O'CONNOR LLP), should NDNB decide in its discretion and/or for regulatory, organizational, and/or administration purposes, or become obliged, recommended, requested, and/or compelled (*either voluntarily or involuntarily*) either through a re-organization, merger, acquisition, dissolution, registration requirements with or by a secretary of state, a tax agency, state CPA mobility law(s), or change, revision, modification, or status with a regulatory agency such as a state accountancy board, the AICPA, a peer review committee, the PCAOB, or other circumstance, agreement, or requirement to change or to use another

professional firm name. In the event that one or more CPA firms evolve from NDNB, the firm representing the highest equity interest of the NDNB partner group shall be the successor firm to NDNB for purposes of this engagement letter and thus the successor firm for purposes of this engagement or any multi-year engagement and/or the related engagement compensation, receivables, and/or damages, if applicable, due from the Service Organization. Should this engagement, or part thereof, or the subject SOC report of this engagement be issued by a substitute, surrogate, or an otherwise exchanged service auditor in lieu of NDNB, then NDNB shall be properly deemed to have completed this same engagement, or part thereof, and/or the subject SOC report of this engagement for purposes of the satisfaction and completion of this engagement letter or part thereof.

12. If your organization is a publicly-traded company, or under the authority of any reporting of the PCAOB (Public Company Accounting Oversight Board, et al) or the PCAOB attestation and auditing standards, or if otherwise applicable, the Service Organization shall pay an agreed engagement surcharge amount of $4,000 (*four thousand dollars*) at the conclusion of the engagement to cover the PCAOB and state regulatory costs associated with NDNB fulfilling the engagement for services. If the Service Organization is a publicly-traded company under the authority of the PCAOB, the Service Organization may be required to fulfill any related costs associated to the PCAOB as they may further require. If your organization is a publicly-traded company, affiliated with a publicly-traded company, or treated as a division or otherwise consolidated into a publicly-traded company for financial statement reporting purposes, then NDNB (or other party as may be designated in the section above) should be notified as NDNB requires such knowledge before commencement and planning of the engagement.

13. As part of the basis of the bargain and the timing of the execution of this engagement letter, the Service Organization has committed to the completion of the schedule for the test date(s)/period(s) as reflected within the schedule of services as represented in Attachment 3 and as may be further described within this engagement letter. Otherwise, subject to the terms and conditions for a termination included within this agreement and the fees due for the schedule up to the point of a termination, the Service Organization shall have the right to terminate this engagement letter or the schedule hereunder (if timely requested) without presenting cause. A notice of termination given by the Service Organization (in writing and containing any amounts due) shall be effective seven (7) days after transmittal by the Service Organization (with use of certified U.S. Mail) in a manner made complete and effective as provided within engagement letter. If the effective date of the termination (with any proper paid amounts due) is more than sixty (60) days prior to the agreed beginning of the testing period (in the case of type two) or the test (validation) date (in the case of a type one) for a given attest report included within this engagement letter, the Service Organization shall have no more liability to NDNB for additional services based on any such termination except to pay all amounts due to NDNB for services reserved, allocated, and/or expended up to the effective date of termination and any associated liquidating damages and/or termination fees otherwise due within this engagement letter in order to perfect the termination. Any excess payment amounts made by the Service Organization to NDNB shall be refunded to the Service Organization within ninety (90) days after determination thereof. If the effective date of the termination is on or less than sixty (60) days prior to the agreed beginning of the testing period (in the case of type two) or test date (in the case of a type one) for a given attest report included within this engagement letter, the Service Organization shall forfeit all payments made prior to the effective date of the termination and owe any amounts due

for same testing period (in the case of type two) or test date (in the case of a type one) and preceding amounts due. After the effective date of termination (a termination made in writing with proper payment of amounts due), no work will be performed unless authorized in writing by the Service Organization. The Service Organization shall NOT consider this Agreement terminated without the consent of NDNB unless NDNB has collected any and all outstanding fees related to this engagement letter. Failure of the Service Organization to properly terminate and pay fees due under this engagement letter shall necessitate the continuation of schedule and/or billings for the reserved and allocated services described and/or designated within this engagement letter until such time as proper termination of the engagement letter is perfected. NDNB shall at all times rightfully maintain an attitude that auditor's independence may prohibit the release of an auditor's report and/or opinion (or any derivative thereof) where such report and/or opinion is not warranted or deemed not complete for purposes of a User Organization, in the opinion of NDNB.

14. The Service Organization has made one or more time specific on-going appointments for professional services specific to current and/or future time parameters as structured and/or represented within this engagement letter (and the attachments therewith) as test dates/periods. Therefore, the Service Organization understands that based upon, and in reliance of this engagement letter, NDNB (including any other associated entity to/with NDNB as included, provided, or allowed in this agreement) has specifically made an appointment of scheduled time (and specific in time) for the benefit of the Service Organization (and/or other resources whether or not [timely or fully] utilized by the Service Organization) and thus NDNB has forsaken other possible engagements for the activities structured and/or represented in this engagement letter and has provided a discounted fee structure to the Service Organization based on the schedule and/or volume of attestation services. Therefore, NDNB has allocated time and/or resources and made commitments to the on-going engagement test date/periods herein that may have been allocated to other engagements, clients, events, activities, and/or other opportunities but for the commitments to this engagement letter. Therefore, the Service Organization agrees that should the Service Organization (i) propose to terminate this engagement letter; or, (ii) breach this engagement letter by its actions (or any failure to of the Service Organization to participate as a constructive breach), for any reason after the execution of this engagement letter without completing all the relevant testing date(s) / period(s) included in this engagement letter, the Service Organization shall pay an early termination fee and any other fees due to NDNB within 45 days of any termination of this engagement letter. The amount of the early termination fee shall be $8,000 (eight thousand dollars). Timing is of the essence with regard to (i) terms and activities within this engagement letter, and (ii) any payment of a termination fee which would properly effectuate a termination of this engagement letter in the event. Moreover, timing is of the essence with regard to termination payment(s) as the agreed test date/period(s) cannot be terminated after the fact (retroactively) regardless of the circumstances. Otherwise, this engagement letter and an appointment of time is neither timely nor effectively terminated without a payment of the termination fee 30 days in advance of a test date (type one) and/or 90 days prior to the end of a respective test period (type two). In the event that a proper termination fee is NOT paid, the Service Organization shall be in breach and liable to pay for any lapsed or on-going professional services time reserved, allocated, expended, and/or remaining as provided in this engagement letter and any attempted termination of this engagement letter shall not be considered as perfected. Failure to properly make any required termination (and the payments therewith) shall accelerate the amounts due for the services described in the engagement letter. In the event that the

Service Organization breaches, abandons the engagement letter, abandons any engagement activities (or fails to participate in) for any test dates/periods as represented within the engagement letter, or fails to provide proper termination notice with a termination fee, the Service Auditor shall NOT be responsible for mitigating any damages due (as might be otherwise required under law) for time reserved, allocated, expended, and/or remaining damages or fees associated therewith as may be due under this engagement letter and/or the terms covered within this engagement letter. The engagement of any Service Auditor outside this agreement for the services described in this engagement letter without the proper and timely termination of this engagement letter shall constitute a violation of auditor's independence and a de facto breach of this engagement letter by the Service Organization (and any breach by the Service Organization is NOT a proper termination herein) and subject to the terms set above for a breach.

15. As may be required or may reasonably be expected by matter of professional ethics and/or professional responsibility as an independent auditor, the Service Auditor (NDNB or any successor thereof, et al) shall have the right, and reserves such right, to terminate this engagement letter or the work to be performed hereunder in whole or in part for its convenience at any time without written cause of the termination (as this may be to the benefit of both parties that cause is not documented by an independent auditor). Any notice of termination given by NDNB for any reason other than non-payment of invoices prior to the initial date(s) of fieldwork shall be effective three (3) days after transmittal by NDNB. Any notice of termination given by NDNB for any reason other than non-payment of invoices after the initial date(s) of fieldwork shall be effective immediately by NDNB. NDNB shall have no liability to the Service Organization based on any such termination except to return relevant amounts previously paid by the Service Organization for services that were not rendered as of a properly effectuated date of the termination. Following termination of this engagement letter, NDNB shall promptly deliver to the Service Organization all original, unique, and non-facsimile attestation evidence, which is in NDNB's possession on the termination date containing information related to the attestation subject matter assuming that there are no existing disagreements regarding outstanding fees for services performed or other on-going controversies related to the engagement. NDNB shall at all times rightfully maintain an attitude that auditor's independence may prohibit the release of an auditor's report and/or opinion (or any derivative thereof) where such report and/or opinion is not warranted, complete, or does not involve the independence of the auditor for whatever reason as may be determined by NDNB. After the effective date of termination, no work will be performed unless authorized in writing by the Service Organization.

16. The Service Organization consents to NDNB's disclosure to relevant parties and prospective clients of the factual description of services provided to the Service Organization as described within this engagement letter.

17. The Service Organization consents to NDNB providing a document imaging company temporary access to any work-papers for the purposes of having the work-papers scanned and converted into electronic format. The Service Organization consents to NDNB engaging a records storage and management company to store work-papers that relate to attests that have not been performed within the last six (6) months.

18. The Service Organization's management understands that NDNB may use some specialized and/or technical personnel on the attest and related attest services that are not certified public accountants. Further, the Service Organization's management understands that these personnel are used due to the specific skill sets or industry knowledge that these persons provide during the engagement and NDNB need not specifically identify during the attest which persons are not CPA's. Additionally, NDNB may utilize CPA's on this engagement which are licensed in other states and practice through the mobility rules, the substantial equivalency rules, or the temporary practice provisions of the State Board of Accountancy.

19. The Service Organization shall timely notify Mr. Alan J. Bambeck, CPA, of NDNB (*as the engagement partner [or in place of, as may be the case] or designation revised*), or the Quality Assurance Director of NDNB, should the Service Organization become aware of any service issues or facts and/or circumstances that would prejudice or even appear to prejudice the independence of NDNB in rendering an opinion requiring the independence of NDNB. Likewise, NDNB shall timely notify the Service Organization should such event come to the attention of NDNB. The Service Organization's requirement to inform includes, but is not limited to, solicitation by the Service Organization to employ NDNB principals or NDNB employees for engagements, work, consulting, or other exchange of consideration whether evidenced by a contract, per diem, or oral contract. Any actual exchange of funds for services or other consideration between the Service Organization and NDNB outside the scope of this agreement shall be evidenced by a separate written agreement in order to anticipate or assume NDNB's actual knowledge thereof.

20. The Service Organization acknowledges that it was not specifically solicited for business through the mail, internet, telephone, or otherwise unless specifically acknowledged and agreed in writing and signed by both parties. Further, the Service Organization may be required to acknowledge this understanding in separate documentation at the request of NDNB.

21. The Service Organization has a specific duty to inform and/or perform with regard to information, terms, and/or subsequent events related to the subject matter and timing of these report(s) within this engagement letter. If NDNB becomes aware, by whatever means, of historical or subsequent events related to any previously issued SOC reports, the Service Organization shall cooperate with NDNB regarding the relevant attestation standards (including AU section 561) and accommodate NDNB accordingly with relevant documentation, management representations, or other inquiry by NDNB as needed and/or determined necessary by NDNB. It is agreed that subsequent events or findings that are brought to the attention of NDNB through whatever means may cause the report to be suspended or withdrawn from use, at least during the relevant inquiry, should the facts & circumstances impeach or otherwise negatively impact the credibility of contents in the attestation opinion, or the contents of any associated report(s), or other relevant documentation..

22. This engagement letter sets forth the complete agreement between the parties and supersedes all previous discussions and communications relating to the subject matter of this engagement letter. NDNB warrants that its services hereunder will be performed in a professional manner, and agrees to re-perform any work not in compliance with this warranty brought to its attention within a reasonable time but NOT later than the earliest of (i) the date that the attest report is provided to a user or a third party, (ii) ten (10)

business days after the delivery to the Service Organization of such report and/or services, OR (iii) nine months after the respective originally scheduled test date or test period. As NDNB will fundamentally rely on the information presented by the Service Organization during the engagement(s) and since the engagement(s) is (are) agreed to be fundamentally an attestation function, NDNB does not warrant that its performance of services under this engagement letter will be error free, free of unintended consequences, or fully comprehensive. The existence of errors or defects in NDNB's services shall NOT be a basis for any finding that NDNB's services have not been performed in the manner warranted above.

THE PRECEDING IS *NDNB'S* ONLY WARRANTY CONCERNING THE SERVICES AND ANY WORK PRODUCT UNDER THIS ARRANGEMENT, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY OR OTHERWISE. ADDITIONALLY, TO THE EXTENT ANY INFORMATION PROVIDED TO *NDNB* BY OR AT THE DIRECTION OF CLIENT IS UNTRUE, INACCURATE OR INCOMPLETE IN ANY WAY, *NDNB* SHALL BE RELIEVED OF ALL LIABILITY FOR ERRORS IN ITS WORK PRODUCT ARISING FROM THE USE OF ANY SUCH INFORMATION IN PERFORMING THE SERVICES.

## Attachment 3
*Engagement Pricing for Schedule*

**The annual agreed fixed fees for the schedule of attestation functions under engagement shall be based on the following information:**

| SOC2 Attestation Engagement(s) for GIGA<br>Covering the Trust Services of Security, Availability, & Confidentiality | Agreed<br>Base Fee |
|---|---|
| **SOC 2 Type ONE Attestation - 2019**<br>Test Date = September 30, 2019, or earlier.<br>Year (#1) 2019 = (sixteen thousand nine hundred dollars) | **$16.900.** |
| **SOC 2 Type Two Attestation – 2020**<br>Test Period = February 1, 2020, to July 31, 2020.<br>Year (#2) 2020 = (sixteen thousand nine hundred dollars) | **$16,900.** |
| **SOC 2 Type Two Attestation – 2021**<br>Test Period = February 1, 2021, to July 31, 2021.<br>Year (#3) 2021 = (sixteen thousand nine hundred dollars) | **$16,900.** |
| **SOC 2 Type Two Attestation – 2022**<br>Test Period = February 1, 2022, to July 31, 2022.<br>Year (#4) 2022 = (sixteen thousand nine hundred dollars) | **$16,900.** |

The attestation reports above shall include the relevant aspects of the criteria for the TSP/C as determined by Service Auditor for "Security," "Availability," & "Confidentiality" only unless the TSP/C scope is expanded based on the request of the Service Organization and acceptance by the Service Auditor. The fees above do not account for an additionally requested TSP/C scope or for other items or subject matter as may be separately stated within this engagement letter. Timing is of the essence for (i) the participation provided by the Service Organization with the appointment of time by the Service Auditor; (ii) the test periods noted above and/or herein; and, (iii) any changes to be made with the scope of activities.

Attestations performed in the future year schedules shall be indexed for inflation according to CPI from the Bureau of Labor Statistics. Thus, the fees for the reports to be issued in 2020, 2021, & 2022 are to be indexed for inflation according to the "consumer price index" (CPI) as relevant for the prior year. Therefore, the fees for the test period ending in 2020 shall be the fee represented above increased by the percentage that represents the CPI for calendar 2019. The fees for the test period ending in 2021 shall be the fee represented above increased by the percentage that represents the CPI for calendar 2019, and then 2020, successively. The fees for the test period ending in 2022 shall be the fee represented above increased by the percentage that represents the CPI for calendar 2019, 2020, and then 2021, successively.

Acknowledgment:

X _____    X _PRESIDENT & CEO_
   Acknowledgement Signature       Title

X __6/15/2019__    X _JOHN R. RING JR. ("JAKE")_
   Date                Print Name

eng ltr attach 3 vf 06-05-2019

EXHIBIT "B"

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

**AAA Case No. 01-22-0003-3283**

**In the Matter of the Arbitration Between:**

**NDNB ASSURANCE, LLP,**
      **Claimant,**

**vs.**

**GIGA DATA CENTER – 1 LLC, a Delaware LLC; GIGA DATA CENTER LLC,**
**a Georgia LLC; and JOHN R. "Jake" RING, a Georgia Resident,**
      **Respondents.**
_____/

## AWARD OF ARBITRATOR

I, Bruce W. Bennett, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties dated June 5, 2019, and having been duly sworn, and having fully reviewed and considered the written documents submitted to me by Claimant's representative Christopher Nickell, and Respondents, having not appeared after due notice, and having failed to present any documents on its behalf, do hereby find and AWARD, as follows:

Findings

Claimant is the prevailing party in this matter against Respondents GIGA DATA CENTER – 1 LLC, a Delaware LLC and GIGA DATA CENTER LLC, a Georgia LLC (collectively known as "GIGA DATA CENTERS") based on breach of contract.

However, Claimant did not meet its burden of proving Respondent JOHN R. "Jake" RING, a Georgia Resident ("Mr. Ring" or "John R. Ring"), made misrepresentations, as required by the parties' engagement letter to hold Mr. Ring, individually, liable to Claimant.

Based on the Findings above, I hereby Award as follows:

I.      GIGA DATA CENTERS shall pay to Claimant the sum of ONE HUNDRED TWENTY-SIX THOUSAND EIGHT HUNDRED FIVE DOLLARS AND SEVENTY-FIVE CENTS ($126,805.75).  This sum consists of past due invoices and accrued interest through the date of this Award totaling $112,599.25, and attorney fees of $14,206.50 paid previously to collect the amount owed.

II.     GIGA DATA CENTERS shall further pay to Claimant post-award interest on any unpaid balance due under this Award at the rate of 1.25% per month.

III.    Claimant takes nothing from Respondent John R. Ring.

The administrative fees of the American Arbitration Association, totaling $1,925.00, and the compensation of the arbitrator, totaling $1,150.00, shall be borne by GIGA DATA CENTERS.  Therefore, GIGA DATA CENTERS shall reimburse Claimant the sum of $3,075.00, representing fees previously incurred by Claimant.

The above sums are to be paid on or before thirty (30) days from the date of this Award.

This Award is in full settlement of all claims submitted to this Arbitration.  All claims not expressly granted herein are hereby denied.

I, Bruce W Bennett, do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument which is my Award.

Date:  <u>March 2, 2023</u>.

SignNow e-signature ID: d44907f674...
03/02/2023 21:32:57 UTC

Bruce W. Bennett
Arbitrator